**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| GROWTECH PARTNERS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-14-3307 |
| | § | |
| | § | |
| ACCENTURE LLP, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND OPINION

Cyriac Abraham is an engineer who works as a project-management consultant for multi-billion dollar energy projects through the company he owns and operates, Growtech Partners. Abraham sued Accenture Services Pvt. Ltd. ("Accenture" or "Accenture India"), Accenture LLP ("Accenture America"), and Accenture PLC ("Accenture Ireland") in Texas state court, alleging that they failed to pay the full amount due under a November 2010 consulting agreement (the "Agreement") with Accenture India. This Memorandum and Opinion addresses the defendants' motion to enforce the arbitration clause in the parties' Agreement. The specific issues are whether the clause covers the claims Abraham asserts and, if so, whether Accenture's initial refusal to arbitrate in response to Abraham's presuit demand waived its right to require Abraham to do so. The court heard oral argument on the motion to compel arbitration. Based on the pleadings, the motions and responses, the arguments of counsel, and the relevant law, the court finds and concludes that Accenture waived its right to arbitration and denies the motion to compel. (Docket Entry No. 7). The reasons for this ruling are set out below.

## I.    Background

In July 2010, Accenture contacted Abraham to discuss having him provide consulting services in both Houston, Texas and New Delhi, India.  Abraham was then living in Houston but wanted to work in New Dehli, where his parents lived.  Although the parties dispute some aspects of their negotiations, they agree that in November 2010, Abraham signed an Agreement to provide consulting services "for a period of 13 weeks," from November 22, 2010 to February 25, 2011, for $105,560.  (Docket Entry No. 7, Ex. 1, ¶ 17).  Abraham alleges in this lawsuit that Accenture's representative, Maxson Lewis, told him that Accenture would renew this Agreement three times during 2011, orally promising that the Agreement would extend through November 1, 2011.  When Accenture did not  renew the Agreement after the first 13 weeks, Abraham sent a letter demanding arbitration in India of a number of claims, including the failure to renew the Agreement.  He invoked the Agreement's arbitration clause, which states:

> Any dispute, controversy, or claim arising out of, relating to, involving, or having any connection with this Agreement or otherwise related to Subcontractor's Services, including any question regarding the validity, interpretation, scope, performance, or enforceability of this dispute resolution provision, shall be exclusively and finally settled by arbitration in accordance with the Indian Arbitration and Conciliation Act of 1996.

(Docket Entry No. 7, Ex. 1, ¶ 16.2).  "All disputes arising under or in connection with [the] Agreement shall be governed and determined by the substantive law of India." (*Id.*, Ex. 1, ¶ 13).

Abraham's presuit demand letter outlined his "tenative list of claims," as follows:

1.    Accenture did not provide documents timely and accurately for obtaining employment visa to India, which resulted in delay . . . . I worked from home in Houston, TX for Accenture per their directions . . . . I also visited Indian consulate in Houston, TX multiple times for obtaining visa to India, and communicated with Accenture to expedite visa process. . . . Accenture is liable to compensate my lost earnings during 22-November-2010 to 12-Dec-2010, which amounts to $24,360.

2.      Bill No GPACNIN004 dated 28-March-2011 for an amount of $9,338 was submitted whereas only $6,496 was paid.  A balance of $2,842 is outstanding.

3.      Bill No GPACNINO06 dated 31-August-2011 for an amount of $11,774 was submitted for work done in weeks 14 and 15 per Accenture's directions. The bill was rejected by Accenture on 02-Sept-2011, and is not paid as of now.

4.      Bill No GPACNIN007 dated 31-August-2011 for an amount of $42,122.50 was submitted for claiming time spent on travel within India per Accenture's directions. The bill was declined by Accenture as payable on 02-Sept-2011.  Travel time is payable by Accenture per terms of the Agreement.  $42,122.50 is claimed hereby.

5.      Per contract accommodation and travel were to be booked by Accenture or their Client and paid by Accenture or client. More often, I had to do the bookings and payments for my travel under this contract. Accenture deducted taxes on these expenses, which would not have been required, had Accenture or their client did the bookings and payments themselves. Bill No GPACNIN009 dated 03-Sept-2011 for an amount of $2,840.11 was submitted for claiming reimbursement of the taxes deducted, and also claiming 30% overhead charges towards bookings, and payments, which were responsibilities of Accenture in the first place.

6.      Accenture had provided me a ticket to return to Houston, TX on 13-April-11. Accenture asked me to change my travel plan to assist them in their meetings at New Delhi and Tamnar (Chattisgarh), and for other purposes.  I had to pay $568 towards fee for ticket change.

7.      Per the Agreement referred above, I was eligible for one fly back (from India to base location (USA) and return to India) after the third month of service provided. Accenture did not provide this flyback.  The cost of a business class ticket Houston – Delhi – Houston was around $8,400 at that time.  I claim $8,400 towards that.

8.      Maxson Lewis representing Accenture contacted me in October 2010 to engage me as Subject Matter Expert for capital project Management in India. Maxson, representing Accenture offered me a contract term of minimum one year. After various discussions over telephone and e-mails, Accenture offered to hire my services vide "Subcontract Agreement (Agreement) dated this 28th October 2010" for a period from November 01, 2010 until Nov 01, 2011 delivered to me by e-mail dated November 01, 2010.  I accepted Accenture's offer vide my e-mail dated November 01, 2010. On November 05, 2010 Accenture sent me another contract "Subcontract Agreement (Agreement) dated this 1st November 2010" for 13 weeks during the period 22nd November, 2010 to 25th February, 2011 for a contract price of $105,560. Maxson Lewis followed the e-mail with a telephone call.  Maxson explained his

inability to get a signed contract for one year duration, until November 01, 2011 as agreed before, since a contract to the tune of $400,000 needed Accenture's top most authorized signatory, who was not present in India at that time, per Maxson. Maxson, in that telephone conversation, requested me to accept the offer in the interest of expediting the engagement, and he assured me to provide a one year contract as agreed earlier. Maxson also pointed out that a provision was made in the offer e-mailed for one flyback from India to base location (USA) and return to India after the third month of service. Maxson also informed me that visa would be applied for six months initially, and would be extended later. In good faith, I accepted the offer contained in the e-mail dated November 05, 2010.

I requested Maxson Lewis and Nilesh Narwekar, after reaching India, to renew my contract to one year, as originally agreed, to which they agreed again. The Agreement dated November 1, 2010 and e-mailed to me on November 05, 2010, which was to expire on 25th February, 2011, was thus extended by mutual consent. On 13-April-2011, the day of my return travel to Houston, TX, Maxson called me and asked me not to take up any other engagement with any other company since my services would be required by Accenture. I agreed to Maxson's request.

I returned to Houston, TX on 13-April-2011. I continued to provide my services per various directions received from Accenture represented by Maxson Lewis, and other Accenture employees authorized by Maxson Lewis. Vide an e-mail dated 01-September-2011, Accenture disclosed that the contract referred above was closed. Accenture did not reveal the date of termination or the reasons thereof. Accenture did not make any payments for my time or services I provided since 14-April-2011. I believed I had a valid contract with Accenture until 01-November-2011 and hence did not take up any other engagement anywhere, with any other company.

Accenture's nonfulfillment of their promises has caused me losses to an amount of $154,280.

9.      Per contract Accenture had the right to terminate my contract by providing me 30 days' notice. Accenture failed to provide this notice and so I claim 30 days' pay to an amount of $35,728.

10.     I claim interest @ 18% on items 1 to 9 listed above under "Tentative list of claims": $133,160.

11.     Total claim under this contract (items 1 to 10 listed above under "Tentative list of claims"): $416,075.

(Docket Entry No. 13, Ex. 1).

Accenture India sent Abraham a response letter dated March 28, 2014 rejecting his "Notice as . . . misconceived and untenable." (Docket Entry No. 13-2, at 2). The letter set out a number of substantive grounds for rejecting the claims and stated that this was "without prejudice to any of our rights, each of which are expressly reserved." (*Id.* at 7).

In response, Abraham sent Accenture a notice that he had invoked the arbitration clause by appointing a specific arbitrator in New Dehli. (Docket Entry No. 13-4). Accenture refused to arbitrate because the claims went "beyond and are wholly outside" the Agreement's terms, and were "unsubstantiated in law, apart from being barred under the express terms of the Contract." (Docket Entry No. 13-4). Accenture demanded that Abraham withdraw his claims and rejected his "'Notice Appointing Arbitrator' . . . as being in respect of claims that are not arbitrable under the Contract and for being unsustainable under Contract or law." (*Id.*). Accenture stated that this letter was also "without prejudice" to its "rights under law and Contract." (*Id.*).

Relying on Accenture India's refusal to arbitrate, Abraham filed this suit in Texas state court in November 2014, naming as defendants Accenture India and its parent companies, Accenture Ireland and Accenture America, and asserting claims for fraud, fraudulent inducement; quantum meruit, and promissory estoppel. (Docket Entry No. 1-2). The claims arose from Abraham's allegations that Accenture India's representatives told him that they would execute quarterly contracts to employ him for a one-year period, failed to do so, and did not fully compensate him for his services or the expenses he incurred while working for Accenture. The defendants timely removed, answered, asserting the right to compel arbitration, and moved to compel arbitration under

the parties' Agreement and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, and the implementing legislation, 9 U.S.C. §§ 201-208. (Docket Entry Nos. 1, 6, 7).[1]

In his response, (Docket Entry No. 8), Abraham did not contest that his claims fell within the arbitration provision's broad scope. He argued that the defendants waived their right to compel arbitration because they had rejected his presuit arbitration demand and that forcing him to arbitrate in India now, after he has moved back to Houston and filed suit here, would be prejudicial. Accenture replied. (Docket Entry No. 13).[2] The court held a hearing at which counsel argued the motion to compel. (Docket Entry No. 17).

## II.   The Legal Standards

### A.   Motions to Compel Under the Convention and Act

The Convention and its implementing legislation "encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n.15 (1974); *see also Prokopeva v. Carnival Corp.*, 2008 WL 4276975, at *3 (S.D. Tex. Sept. 10, 2008). Federal courts must enforce the Convention on the Recognition and Enforcement of Foreign Arbitral Awards. 9 U.S.C. § 201. "If an international arbitration clause falls under the Convention Act, the Convention requires district

---

[1] June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3 (entered into force with respect to the United States on Dec. 29, 1970). The Convention and its implementing legislation are sometimes referred to as the "Convention Act" or the "New York Convention." *See, e.g., Certain Underwriters at Lloyd's v. Warrantech Corp.*, 461 F.3d 568 (5th Cir. 2006).

[2] Abraham also moved for leave to file a supplemental response in which he argued that the tort-based claims he asserts in this case fall outside the provision's scope. (Docket Entry No. 18). Accenture opposes that motion, contending that Abraham waived the argument by failing to include it in his response. (Docket Entry No. 19). The motion for leave is granted.

courts to order arbitration." *Lim v. Offshore Speciality Fabricators, Inc.*, 404 F.3d 898, 903 (5th Cir. 2005) (quotation omitted). "In determining whether the Convention requires compelling arbitration in a given case, courts conduct only a very limited inquiry." *Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 339 (5th Cir. 2004). There are four requirements to determining whether a claim "falls under" the Convention and requires arbitration: "(1) there is a written agreement to arbitrate the matter; (2) the agreement provides for arbitration in a Convention signatory nation; (3) the agreement arises out of a commercial legal relationship; and (4) a party to the agreement is not an American citizen." *Id.* (quotations omitted). "If these four requirements are met, the court must stay the action and make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement 'unless it finds that the said agreement is null and void, inoperative or incapable of being performed.'" *Baricuatro v. Indus. Personnel & Mgmt. Servs., Inc.*, 927 F. Supp. 2d 348, 359 (E.D. La. 2013) (quoting *Freudensprung*, 379 F.3d at 339).

"When the Convention Act governs the recognition and enforcement of an arbitration agreement or award, . . . the [Federal Arbitration Act] applies only 'to the extent that [the FAA] is not in conflict with [the Convention Act] or the Convention as ratified by the United States.'" *Freudensprung*, 379 F.3d at 339 (quoting 9 U.S.C. § 208). Section 3 of the FAA requires federal courts, on a party's motion, to stay litigation of claims subject to arbitration. *See* 9 U.S.C. § 3. A motion to stay or dismiss under § 3 in favor of arbitration requires a court to decide "whether there is a valid agreement to arbitrate between the parties," and "whether the dispute in question falls within the scope of that arbitration agreement." *Tittle v. Enron Corp.*, 463 F.3d 410, 418 (5th Cir. 2006) (citation omitted); *see also Sharpe v. AmeriPlan Corp.*, 769 F.3d 909, 914 (5th Cir. 2014) (same). The "first step of the analysis—the validity of an agreement—is governed by state law

contract principles." *Sharpe*, 769 F.3d at 914. "Only at the second step of the analysis—determining the scope of the arbitration agreement—do courts apply the federal policy favoring arbitration and resolve ambiguities in favor of arbitration." *Id.* "Once the court finds that the parties agreed to arbitrate, it must consider whether any federal statute or policy renders the claims nonarbitrable." *Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 214 (5th Cir. 2003) (quotation omitted).

### B.    Including Nonsignatories in the Arbitration

"Although arbitration is a matter of contract that generally binds only signatories," nonsignatories can compel arbitration." *Brown v. Pac. Life Ins. Co.*, 462 F.3d 384, 398 (5th Cir. 2006). "'[T]raditional principles' of state law allow a contract to be enforced by or against nonparties to the contract through 'assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel.'" *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009) (quoting 21 R. LORD, WILLISTON ON CONTRACTS § 57:19, p. 183 (4th ed. 2001)). "[S]ometimes a person who is not a party to the agreement can compel arbitration with one who is, and vice versa." *Meyer v. WMCO-GP, LLP*, 211 S.W.3d 302, 305 (Tex. 2006) (footnotes omitted). For example, "a person who seeks by his claim to derive a direct benefit from the contract containing the arbitration provision may be equitably estopped from refusing arbitration." *Id.* (quotation omitted); *see also Brown*, 462 F.3d at 398 ("[E]quity does not allow a party to seek to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration's applicability because the defendant is a non-signatory." (quotation omitted)).

## C.    Waiver

"The right to arbitration, like any other contract right, can be waived.  A party waives his right to arbitrate when he [1] actively participates in a lawsuit or [2] takes other action inconsistent with that right." *Miller Brewing Co. v. Fort Worth Distributing Co., Inc.*, 781 F.2d 494, 497 (5th Cir. 1986).[3]  Courts generally hesitate to find waiver, given the strong presumption of enforceability. *See, e.g.*, *MC Asset Recovery LLC v. Castex Energy, Inc.* (*In re Mirant Corp.*), 613 F.3d 584, 588 (5th Cir. 2010); *Republic Ins. Co. v. PAICO Receivables, LLC*, 383 F.3d 341, 344 (5th Cir. 2004); *Subway Equip. Leasing Corp. v. Forte*, 169 F.3d 324, 326 (5th Cir. 1999); *see also Sibley v. Tandy Corp.*, 543 F.2d 540, 542 (5th Cir. 1976) ("The burden on one seeking to prove a waiver of arbitration is a heavy one.").  "The question of what constitutes a waiver of the right to arbitration depends on the facts of each case." *Tenneco Resins, Inc. v. Davy Int'l, AG*, 770 F.2d 416, 420 (5th Cir. 1985).

---

[3] *See also Tristar Fin. Ins. Agency, Inc. v. Equicredit Corp. of Am.*, 97 F. App'x 462, 465 (5th Cir. 2004) ("Waiver is ordinarily the knowing and voluntary relinquishment of a known right."); *Zuckerman Spaeder, LLP v. Auffenberg*, 646 F.3d 919, 922 (D.C. Cir. 2011) ("[W]e have examined the record to determine whether the party seeking a stay has acted in a manner inconsistent with any intent to assert its right to arbitrate." (quotations omitted)); *Sherrock Bros., Inc. v. DaimlerChrysler Motors Co., LLC*, 260 F. App'x 497, 500 n.3 (3d Cir. 2008) ("'Waiver' is a voluntary and intentional abandonment or relinquishment of a known right and may be established by a party's express declaration or by a party's undisputed acts or language so inconsistent with a purpose to stand on the contract provisions as to leave no opportunity for a reasonable inference to the contrary." (quotations omitted)).

III.   **Analysis**

    A.   **Whether the parties' Agreement Falls Under the Convention, the Act, and the FAA**

        1.   **A Written Agreement to Arbitrate**

Abraham does not dispute that he signed an Agreement with Accenture India in which he agreed to provide professional subcontracting services for 13 weeks. (Docket Entry No. 7, Ex. 1, ¶ 17). Nor does Abraham dispute the presence or validity of the Agreement's arbitration clause. (*Id.*, Ex. 1, ¶ 16.2). That clause applies to "[a]ny dispute, controversy, or claim arising out of, relating to, involving, or having any connection with this Agreement or otherwise related to Subcontractor's Services." (*Id.*). The "professional services to be provided by the Subcontractor personnel" are "set out in Exhibit A," which provides that "[t]he scope of this project, and in extension that of the Subcontractor, would be to design and operate the [Project Management Office] for" four specific power plants in India and "[o]ther Power projects in India where Accenture is providing/proposing to provide [Project Management Office] services." (*Id.*, Ex. 1, Ex. A).

Abraham contends that although the parties agreed to arbitrate disputes arising out of and related to his performance of the 13-week Agreement that he signed, they did not agree to arbitrate disputes arising out of Accenture's fraudulent misrepresentations that he would be entitled to 3 additional 13-week contracts after the first expired. (Docket Entry No. 18). Abraham argues that he "was promised four consecutive identical quarterly consultant contracts," that Accenture "failed to offer and execute the subsequent second quarter contract as represented," and that he "relied [on Accenture's representations] in terminating existing employment." (*Id.*, at 9). He contends that nothing in the Agreement "reach[es] back to disclaim liability for fraudulent misrepresentation in

all negotiations between Accenture and [Abraham]." (*Id.* at 10).  He argues that his "suit falls outside the scope of the Agreement and is not subject to an arbitration clause" because his "fraud claim . . . does not stem from the satisfactorily performed and completed Agreement in which the arbitration provision is found." (*Id.*, at 9).

Abraham's argument fails to account for the arbitration clause's breadth.  The clause covers not only those disputes "arising out of" the Agreement, but also disputes "relating to, involving, or having any connection with this Agreement or otherwise related to [Abraham's] Services." (Docket Entry No. 7, Ex. 1, ¶ 16.2).  "[C]ourts distinguish 'narrow' arbitration clauses that only require arbitration of disputes 'arising out of' the contract from broad arbitration clauses governing disputes that 'relate to' or 'are connected with' the contract." *Pennzoil Exploration & Prod. Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1067 (5th Cir. 1998) ("With such a broad arbitration clause, it is only necessary that the dispute 'touch' matters covered by the [Agreement] to be arbitrable"); *Am. Recov. Corp. v. Computerized Thermal Imaging, Inc.*, 96 F.3d 88, 95 (4th Cir. 1996) (finding that the plaintiff's quantum meruit claim was "sufficiently related to [a] consulting agreement as to fall within the scope of the arbitration clause" because "a claim may arise outside of an agreement and yet still be related to that agreement").

Abraham also argues that "[t]his is a Texas tort case sounding in fraud," "not a contract" case. (Docket Entry No. 18, at 4).  But "parties to such agreements cannot avoid them by casting their claims in tort, rather than in contract." *Grigson v. Creative Artists Agency, LLC*, 210 F.3d 524, 526 (5th Cir. 2000); *Long v. Silver*, 248 F.3d 309, 318 (4th Cir. 2001) (holding that the plaintiff's claim that he was fraudulently induced into entering into the agreement containing a broadly worded arbitration clause was "significantly related to the [] Agreement and [] subject to arbitration"),

*overruled on other grounds by Hertz Corp. v. Friend*, 130 S. Ct. 1181 (2010); *P&P Indus., Inc. v.*

*Sutter Corp.*, 179 F.3d 861, 871 (10th Cir. 1999) (holding that the "tort-based claims alleged by [the

plaintiff]," including common law fraud, "ar[o]se out of, or relate[d] to, the Agreement itself"); *see*

*also Am. Recovery*, 96 F.3d at 95 ("[W]e must analyze the relationship between the claim and the

agreement without regard to 'the legal label assigned to the claim.'").  "[W]hen confronted with

arbitration agreements, [courts] presume that arbitration should not be denied 'unless it can be said

with positive assurance that an arbitration clause is not susceptible of an interpretation which would

cover the dispute at issue.'" *Sedco, Inc. v. Petroleos Mexicanos Mexican Nat'l Oil Co. (Pemex)*, 767

F.2d 1140, 1145 (5th Cir. 1985); *see also id.* at 1146 ("[A]s a general rule, whenever the scope of

an arbitration clause is in question, the court should construe the clause in favor of arbitration.").

Abraham's claims against Accenture are within the arbitration clause's broad scope.

### 2.      Arbitration in a Convention Signatory Nation

The Agreement's arbitration clause provides for arbitration in India, (Docket Entry No. 7,

Ex. 1), which is a signatory to the Convention. *See Fertilizer Corp. of India v. IDI Mgmt., Inc.*, 517

F. Supp. 948, 950 (S.D. Ohio 1981) (observing that India "ratified the treaty in 1961").  Abraham

does not dispute that this element is satisfied.

### 3.      Arising out of a Commercial Legal Relationship

The Fifth Circuit has defined a commercial legal relationship as "'including a transaction,

contract, or agreement described in section 2 of [Title 9]'—that is, either a maritime transaction or

a contract involving commerce." *Freudensprung v. Offshore Technical Servs., Inc.*, 379 F.3d 327,

339 (5th Cir. 2004).  In *Freudensprung*, the Fifth Circuit concluded that a contract retaining the

plaintiff "to perform 'hook-up, engineering, planning, inspection . . . [and] pipeline work'" arose

"out of a 'commercial legal relationship.'" *Id.* at 339; *see also Francisco v. STOLT ACHIEVEMENT MT*, 293 F.3d 270, 273 (5th Cir. 2002) (applying the Convention to "a written employment contract"). The consulting services Abraham agreed to provide Accenture in the Agreement containing the arbitration clause arise out of a commercial legal relationship.

### 4.   One Party to the Agreement Is Not an American Citizen

Abraham does not dispute this element. Section 202 of the Convention Act states that "[f]or the purpose of this section a corporation is a citizen of the United States if it is incorporated or has its principal place of business in the United States." 9 U.S.C. § 202. Accenture India is incorporated in India. (Docket Entry No. 1-2, at 2). It is not an American citizen under the Act. And the Agreement independently falls under the Convention because it "envisaged performance abroad" and "there is a reasonable connection between the parties' commercial relationship and a foreign state"—India—"that is independent of the arbitral clause itself." *See Freudensprung*, 379 F.3d at 341. This element is satisfied.

### 5.   Summary

The arbitration clause in the Agreement falls under the Convention, and the parties' disputes are within the broad scope of the arbitration clause. The next issue is whether the nonsignatory defendants may enforce the clause.

### B.   Whether the Nonsignatory Defendants May Enforce the Arbitration Clause

Accenture America and Accenture Ireland are not signatories to Abraham's professional services Agreement containing the arbitration clause. Although Abraham frames his claims against all the defendants in tort, rather than contract, he relies on the Agreement in his state-court petition. This pleading cites sections 4.1 and 21 of the Agreement as evidence of what the terms of the

allegedly promised one-year agreement would have contained. (Docket Entry No. 1-2, ¶¶ 17-20). The petition also seeks to recover money that Abraham alleges he is due for services he performed under the Agreement. (Docket Entry No. 1-2, ¶ 25). Abraham's theory of liability against the nonsignatory defendants is based on their vicarious liability for the signatory defendant's torts relating to the Agreement, and on their agency relationship with the signatory defendant. (Docket Entry No. 1-2, ¶ 29 ("Defendants Accenture America and Accenture Ireland are each liable under the doctrine of vicarious liability and agency.")). A nonsignatory may enforce an arbitration clause against a signatory on agency and estoppel principles. Abraham has invoked agency as a basis of suing the nonsignatories. Estoppel applies to prevent a signatory, such as Abraham, who seeks to "invoke an agreement and claim the benefit of [his] status under it while attempting to escape its consequences." *Westmoreland v. Sadoux*, 299 F.3d 462, 466 (5th Cir. 2002). "[T]he doctrine of estoppel prevents [Abraham] from 'having it both ways.'" *Wash. Mut. Fin. Grp,, LLC v. Bailey*, 364 F.3d 260, 268 (5th Cir. 2004) (quoting *Grigson*, 210 F.3d at 528); *Long*, 248 F.3d at 318 (holding that the non-signatory shareholders" of a subsidiary could "compel arbitration against [the plaintiff] with respect to the issues arising under and relating to" an agreement upon which the plaintiff sought "to claim the benefit of his shareholder status and right to continued employment").[4]

---

[4] Accenture also argues that its nonsignatory parent corporations may compel arbitration because Abraham alleges that they engaged in interdependent and concerted misconduct with Accenture India, a signatory. *See Grigson v. Creative Artists Agency, LLC*, 210 F.3d 524, 527 (5th Cir. 2000). In *Crawford Professional Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249 (5th Cir. 2014), however, the Fifth Circuit made clear that "prior decisions allowing non-signatories to compel arbitration based on federal common law, rather than state contract law, such as *Grigson*, have been modified to conform with [the Supreme Court's decision in] *Arthur Andersen*," which "instructs that a non-signatory to an arbitration agreement may compel a signatory to that agreement to arbitrate based on . . . equitable estoppel if the relevant state contract law so permits." *Id.* at 261-62 (citing *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624 (2009)). Because Texas law does not recognize concerted-misconduct estoppel as a basis for compelling a party to arbitrate against a nonsignatory, Accenture Ireland and Accenture America may not rely on this theory to compel arbitration. *See In re Merrill Lynch Trust Co. FSB*, 235 S.W.3d 185, 195 (Tex. 2007) (finding "nothing in

The nonsignatory defendants as well as Accenture India may enforce the Agreement's arbitration clause, unless Accenture India waived that right.

## C.    Waiver

Abraham argues that even if his claims fall under the Convention and would otherwise be arbitrable, Accenture India waived its right to enforce the Agreement's arbitration provision when it refused his demand to arbitrate in India and his appointment of an arbitrator there.

On February 28, 2014, Abraham sent Accenture India a letter giving "30 days' notice per sub-section 16.1 [the arbitration provision] of the Subcontract Agreement" and outlining "the claims [he] plan[ned] to present to the Arbitrators through [his] attorneys." (Docket Entry No. 13-1). Among other claims, Abraham asserted that Accenture India had broken its promise to compensate him for services he provided between November 2010 and November 2011. (*Id.*, at 4). The written Agreement stated that Accenture would pay Abraham for 13 weeks of consulting services from November 22, 2010 to February 25, 2011. Abraham alleged that Accenture India's representatives had assured him that the Agreement would be extended to employ him for an entire year, but that to avoid the requirement that upper management approve contracts over a certain amount, the year-long contract would be divided into four 13-week contracts. (*Id.*). Abraham's February 2014 letter alleged that, contrary to these assurances, Accenture India never renewed the original 13-week Agreement. Abraham also asserted that Accenture India had failed to compensate him for certain

---

Texas contract law . . . that would require the plaintiffs to arbitrate with Merrill Lynch's [nonsignatory] affiliates"); *see also Inland Sea, Inc. v. Castro*, 420 S.W.3d 55, 59 (Tex. App.–El Paso 2012, pet. denied) (holding that the nonsignatory defendant could not rely on concerted-misconduct estoppel to compel arbitration against a signatory plaintiff because the Texas Supreme Court has not "adopted the type of concerted misconduct estoppel relied upon by [the defendant]" (citing *In re Merrill Lynch*, 235 S.W.3d at 191-95)).

expenses he incurred during the original 13-week Agreement and for lost earnings caused by Accenture's failure to help him obtain a visa timely.  (*Id.*).  The February 2014 letter closed with a threat "to start proceedings for resolution of disputes per the Agreement" if "the disputes [were] not solved in the thirty days' period starting" on February 28, 2014.  (*Id.*).

Accenture India responded on March 28, 2014.  (Docket Entry No. 13-2).  The letter, which contained the words "**WITHOUT PREJUDICE**" at the top, stated that Abraham's claims lacked merit, including that he was not entitled to compensation for services after the Agreement ended on February 25, 2011.  (*Id.*, at 6, ¶ 8).  Accenture stated that the claims went "beyond the terms of the Contract and are also unsubstantiated in law" and that Abraham had "failed to provide any documentation/evidence to support [his] several claims."  (*Id.*, at 2).  Accenture closed the letter by reiterating that it was "without prejudice to any of [Accenture's] rights, each of which are expressly reserved."  (*Id.*, at 7).

On May 29, 2014, Abraham responded, reiterating his previous letter's complaints and stating that he intended to present them "before the Ld. Abitrators, if . . . not settled amicably between" the parties.  (Docket Entry No. 13-3, at 2).  Abraham stated that Accenture's response left him "no option . . . but to invoke the Arbitration Clause as per Clause 16 of the Agreement dated [November 1, 2010] entered between" Abraham and Accenture India.  (*Id.* at 3).  The May 2014 letter gave Accenture India notice that Abraham "nominated [his] Arbitrator, pursuant to Clause 16 of the Agreement dated [November 1, 2010]," and directed Accenture India "to nominate [its] Arbitrator within a period of 30" days as required by the Indian Arbitration and Conciliation Act of 1996.  (*Id.*).

Accenture India responded nearly one month later. The June 2014 response letter began with the words "**WITHOUT PREJUDICE**" and rejected Abraham's claims as "misconceived, untenable and wholly non-arbitral under contract and/or law." (Docket Entry No. 13-4, at 2). Accenture reiterated its arguments from its March 2014 letter that Abraham's claims were "frivolous and baseless." (*Id.*). But the June 2014 letter also explained in detail why Accenture India believed that Abraham's claims were not arbitrable.

> "At the outset[,]
>
> the claims sought to be raised by you in your letter raised 28 February 2014 ("Notice of Dispute"), purportedly in terms of the Sub-Contract Agreement dated 1 November 2010 ("Contract") between Accenture Services Private Limited (India Domestic Business) ("Accenture") and M/s Growtech Partners ("Growtech"), *are not arbitrable as they go beyond and are wholly outside the terms of the Contract itself*."

(*Id.*, at 3 (emphasis added)). The June 2014 letter also stated that Abraham's "[n]otice appointing Arbitrator [was] an incorrect and an improper reference to arbitration and, therefore, liable to be withdrawn/rejected on this ground alone." (*Id.*).

Accenture's June 2014 letter directed Abraham to several "terms of the Contract which evidence that each one of [his] claims under the Notice of Dispute [were] either wholly outside the terms of the Contract or contrary to settled law, and, therefore, not arbitrable." (Docket Entry No. 13-4, at 3). First, the letter pointed to the Agreement's provisions specifying the 13-week term and requiring a written agreement to change the terms. (*Id.*, at 3 (citing Clauses 17 and 22)). Because "the Contract ha[d] not been varied/amended/extended in any way, in writing or otherwise, at the end of the contractual period i.e. on 25 February 2011 and all obligations of the parties under the Contract have been fully discharged," the letter argued that Abraham's "claims for the period after the completion of the term ending on 25 February 2011 [were] . . . extra-contractual and [went] well

beyond the terms of the Contract." (*Id.*). As a result, the letter contended, Abraham's "claims [were] non-arbitrable and Accenture [was] not liable to pay any amounts to [him] either under Contract or law." (*Id.*).

Second, the June 2014 letter pointed to the Agreement's merger clause and other provisions precluding reimbursement for expenses incurred before December 13, 2010. (Docket Entry No. 13-4, at 3 (citing Clauses 21 and 22)). The letter "categorically rejected" "any claim in respect of alleged services rendered prior to . . . the date of [Abraham's] commencement of [his] services in India . . . for being beyond the written terms of the Contract . . . and therefore, non-arbitrable in nature, apart from being contractually unsustainable." (*Id.*).

Third, "even assuming (without admitting) that the purported claims [arose] out of an oral agreement between the parties," the June 2014 letter continued, "an arbitration agreement between the parties has to be in writing." (Docket Entry No. 13-4, at 4). Because the Agreement "between the parties expired . . . on 25 February 2011 and there was no subsequent amendment, revision or extension," the "Arbitration Agreement under the Contract [could not] be, and [was] no longer operative between the parties after 25 February 2011." (*Id.*).

Based on these and other reasons, the letter "call[ed] upon [Abraham] to immediately withdraw all [his] baseless and unsubstantiated claims raised *vide* the Notice of Dispute dated 28 February 2014," "reject[ed] [his] Notice appointing Arbitrator (i.e. appointing Mr. Rana Mukherjee as [Abraham's] nominee arbitrator) as being in respect of claims that are not arbitrable under the Contract, and for being unsustainable under Contract or law," and "call[ed] upon [Abraham] to withdraw [his] Notice appointing Arbitrator." (Docket Entry No. 13-4, at 4). The letter closed by stating that "[t]his present notice [was] being issued without prejudice to any rights and remedies

that Accenture may have under law and Contract" and that Accenture India "reserve[d] its rights to claim any legal costs that may be incurred in this regard." (*Id.*).

In November 2014, Abraham returned to Texas and filed this suit. After timely removing, Accenture answered, asserting that his claims were "barred in whole or in part because the controlling [A]greement requires that this dispute be submitted to arbitration," and promptly moved to compel arbitration. (Docket Entry Nos. 1, 6, 7). Abraham asserts waiver.

### 1.    Whether Accenture Acted Inconsistently with a Known Right

Accenture has not "waive[d] [its] right to arbitrate [by] . . . actively participat[ing] in a lawsuit." *See Miller Brewing*, 781 F.2d at 497; *Williams v. Cigna Fin. Advisors, Inc.*, 56 F.3d 656, 661 (5th Cir. 1995). The issue is whether Accenture expressly waived its right to arbitrate by refusing to do so when Abraham invoked the Agreement's arbitration clause in his February 2014 and May 2014 letters.

Abraham argues that Accenture's communications unambiguously and expressly waived its known right to arbitrate his claims. He cites *In re Tyco Int'l Ltd. Sec. Litig.*, 422 F.3d 41 (1st Cir. 2005). In that case, Tyco and its chief financial officer, Mark Swartz, signed a severance agreement requiring the parties to submit "all disputes arising from or concerning [Swartz's] employment at Tyco" to binding arbitration. *Id.* at 42. The next day, Swartz was indicted in state court for "abusing his position [at Tyco] . . . to further his own financial gain." *Id.* "Tyco submitted a demand for arbitration against Swartz . . . seeking $400 million in damages for essentially the same abuses described in the pending criminal indictment." *Id.* Swartz unsuccessfully sought a postponement of any arbitration until after his criminal trial, then sent Tyco a letter stating:

Mr. Swartz does not consent to the AAA's administration of this matter and does not agree to participate in the arbitration filed with the AAA. . . .

Our position . . . is that we have significant concerns about participating in any arbitration given the pendency of the criminal case against Mr. Swartz and its potential implication of his Fifth Amendment rights. Nevertheless, we discussed the possibility of determining whether any agreement could be reached concerning various preliminary matters. We did not however, reach any agreement, including whether to use the AAA as a forum. . . .

I reiterated my concern that we would need to seek a stay of any arbitration at some time in the future, and that we did not know how the AAA would handle such an application [for a stay]. I suggested in our conversation that—prior to agreeing to the use of the AAA—we wanted to learn more about the manner in which such an application would be handled, and I suggested a preliminary conference with someone from the AAA to discuss the matter. . . .

[W]e would ask that you reconsider your position that you will not consent to a stay of any arbitration pending the resolution of Mr. Swartz's criminal case. . . . Furthermore, we would consider agreeing to a stay of the arbitration that included a provision for the ultimate use of the AAA (and the use of an arbitrator selection process similar to that outlined in your proposal) after the criminal matter is resolved. Please advise me if you are interested in discussing such a potential agreement.

*Id.* at 42-43 (quoting letter).

"During the ensuing five-month period, the parties engaged in no further correspondence, and the AAA dismissed the Tyco demand for arbitration . . . for lack of written consent" from Swartz. *Id.* at 43. Tyco sued Swartz in federal court. Swartz moved to dismiss, "citing the binding arbitration clause in the Agreement." *Id.* The district court denied the motion, concluding that Swartz had "'actively resisted arbitration, claiming that it should be delayed until the criminal charges now pending against him have been resolved.'" *Id.* (quoting district court).

On appeal, the First Circuit affirmed, holding that "[t]he district court reasonably concluded—based upon the totality of the circumstances—that Swartz had waived his arbitral rights unequivocally." *Id.* at 44. The opening paragraph of Swartz's letter stated that he "'does not consent

to the AAA's administration of this matter and does not agree to participate in the arbitration filed with the AAA,'" and "failed to propose an arbitrator who might meet with his approval." *Id.* at 45 (quoting letter). Swartz's conduct was also inconsistent with arbitration:

> . . . even assuming that the November 6 letter left some reasonable doubt as to Swartz's intent, his ensuing conduct removed it. For more than five months, Swartz did nothing. He contends that his November 6 letter placed the ball in Tyco's court, but the letter itself contained a sentence which prescribed the precise conditions for a Tyco reply: "Please advise me if you are interested in discussing such a potential agreement," viz., an agreement whereby the AAA would be the arbitrator in a proceeding stayed for an indeterminate time period awaiting resolution of his criminal case. Tyco's failure to respond to the Swartz counter-offer within a reasonable time connoted Tyco's rejection of a term to which its objection had already been made abundantly clear, thus placing some onus upon Swartz to go forward. Instead, Swartz waited until the AAA dismissed the Tyco demand for arbitration, more than six months after its filing. Further, Swartz does not contend that he undertook any of the preliminary steps, described in the November 6 letter, to consult with the AAA regarding the requirements or prospects for a stay.

*Id.* at 45-46.

Accenture's June 2014 letter is even more unequivocal than Swartz's letter in *Tyco*. The June 2014 letter repeatedly and categorically rejected Abraham's claims as "wholly" "non-arbitrable" in nature, refused to follow the Agreement's arbitration procedures, and implicitly threatened to seek legal costs against Abraham if he did not withdraw his request to arbitrate.

*O.J. Distributing, Inc. v. Hornell Brewing Co.*, 340 F.3d 345 (6th Cir. 2003), is also instructive. O.J. Distributing had entered an agreement with Hornell Brewing Company for distributing its AriZona brand teas and soft drinks in the greater Detroit, Michigan area. In April 1997, Hornell informed O.J. that it would stop supplying O.J. with its products. O.J. responded that this would breach the parties' 1995 distribution agreement and threatened legal action if Hornell stopped supplying AriZona beverages. Over the next year, the parties corresponded frequently and

engaged in negotiations. At various times, Hornell's representatives denied the 1995 agreement's existence even though O.J.'s counsel repeatedly referenced and sent copies of the agreement to Hornell's counsel. *See id.* at 357-58. In May 1998, O.J. sued in federal court, alleging that Hornell had breached the agreement. In August 1998, Hornell sent O.J. letters demanding arbitration under the agreement's mandatory arbitration provision. In October 1998, Hornell moved to compel arbitration. O.J. argued that Hornell had waived its right to arbitrate, but the district court disagreed because Hornell "had made [O.J.] aware by way of the August of 1998 letter that the matter was to be arbitrated pursuant to the [a]greement." *Id.* at 359.

The Sixth Circuit reversed, concluding that Hornell "waived its right to arbitrate due to its [largely presuit] actions of engaging in negotiations with [the] [p]laintiff for approximately fifteen months (April of 1997 through August of 1998), while at the same time denying the existence of the Agreement and, therefore, the arbitration provision, to the prejudice of" O.J. *Id.* at 357. Hornell "was aware of the Agreement's existence, and in fact had possession of the Agreement by way of [O.J.'s] counsel in May of 1997, January of 1998, and April of 1998, and therefore was also aware of the arbitration provision therein," yet it "did not maintain that [O.J.'s] claims were subject to arbitration until August of 1998, and did not demand arbitration until October of 1998, after the entry of default was made." *Id.* at 358. The court rejected Hornell's argument that it timely asserted arbitration once the suit was filed in May 1998, noting that it was "after a year or more of claiming that [Hornell] was unaware of the Agreement's existence—despite [O.J.'s] assertions to the contrary and despite [O.J.] providing [Hornell] with a copy of the Agreement when requested—and after engaging in talks with [O.J.], thus providing a basis for [O.J.] to believe that [Hornell] agreed that the matters were not the type for which arbitration applied." *Id.* at 358.

Although less time elapsed between Abraham's February 2014 initial arbitration demand and Accenture's January 2015 answer and February 2015 motion to compel than in *O.J. Distributing*, Accenture India's express refusal to arbitrate was more specific and unequivocal than Hornell's denial of the distributing agreement's existence in *O.J. Distributing*. As in *O.J. Distributing*, Accenture's failure to demand arbitration until nearly a year after it "categorically refused" Abraham's arbitration demand "provid[ed] a basis for [Abraham] to believe that [Accenture India] agreed that the matters were not the type for which arbitration applied." *See id.* at 358.

*Brown v. Dillard's*, 430 F.3d 1004 (9th Cir. 2005), is similar. The plaintiff filed a notice to arbitrate her wrongful termination claim with the AAA under the parties' employment agreement, which specified AAA arbitration. The AAA sent letters to her employer, Dillard's, which "did not respond" and "did [not] pay its share of the filing fee." *Id.* at 1008. Dillard's lawyer "told Brown that her complaint had no merit and that Dillard's refused to arbitrate." *Id.* at 1009. Brown then sued Dillard's in California state court. Dillard's removed and moved to compel arbitration. The district court denied the motion, and the Ninth Circuit affirmed, concluding that Dillard's arbitration agreement "require[d] [it] to arbitrate 'claims of wrongful discharge,'" even if Dillard's believed they were groundless:

> If Dillard's believed Brown's claim was meritless, its proper course of action was to make that argument in arbitration. Instead, Dillard's refused to participate in the arbitration process at all.

*Id.* The Ninth Circuit observed that it was "more accurate to describe Dillard's behavior as breach of contract," but it "note[ed] that if [the panel] were to approach this case as a waiver case, [it] would have no difficulty finding that Dillard's waived its right to arbitrate Brown's claims" because "Dillard's concede[d] that it knew of its right to arbitrate, and its refusal to arbitrate after being

served with Brown's notice of intent to arbitrate was an act inconsistent with that right." *Id.* at 1012; *see also Hill v. Ricoh Americas Corp.*, 603 F.3d 766, 773 (10th Cir. 2010) ("In our view, one could reasonably conclude that Dillard's waived its right to arbitrate in the narrow sense of waiver" because its "actions were so 'inconsistent with the right to arbitrate' that . . . it had intentionally relinquished its contractual right to arbitrate." (citation omitted) (citing *Brown*, 430 F.3d 1004, with approval)); *Lane, Ltd. v. Larus & Bro. Co.*, 243 F.2d 364, 367 (2d Cir. 1957) (finding that the defendant waived its right to arbitrate through its presuit responses to the plaintiff's demand to arbitrate certain issues that the defendant argued were not "the proper subject of arbitration under the terms of the agreement").[5]

Accenture India argues that "no case in the Fifth Circuit has found express waiver involving *pre-suit* correspondence, as is the case here." (Docket Entry No. 13, at 6). Although the Fifth Circuit has not found waiver based solely on presuit communications or conduct, it has found waiver based in part on presuit conduct inconsistent with the right to arbitrate. In *Blake Construction Co. v. United States*, 252 F.2d 658 (5th Cir. 1958), for example, the Fifth Circuit affirmed the district court's finding of waiver based on both pre- and postsuit conduct:

> this record reflects that Subcontractor was making every effort to negotiate and discuss this problem with the Contractor. In the extensive correspondence from Subcontractor, much of which went unheeded and even unanswered, Subcontractor indicated plainly its willingness to arbitrate. Typical of the Contractor's studied indifference to the demand for payment of the claim for arbitration was Contractor's

---

[5] In *Cox. v. Ocean View Hotel Corp.*, 533 F.3d 1114 (9th Cir. 2008), the Ninth Circuit refused to find waiver based on an employer's presuit response that "it did not consider [the plaintiff's] claim ripe for arbitration" because the employer's "understanding that the dispute was not yet ripe for arbitration" made it "at least a debatable proposition whether [the employer's] actions [were] inconsistent with the right to arbitrate." *Id.* at 1117, 1125-26 (quotations omitted). Unlike the employer's communication in *Cox*, Accenture India's response letter to Abraham unequivocally refused to arbitrate at any time and was clearly inconsistent with its contractual right to arbitrate.

> summary rejection of the specific inquiries put to it as to the procedural details of the
> proposed arbitration even though these were matters left initially to the parties under
> the agreed American Institute of Architects rules for arbitration.

*Id.* at 662. The Fifth Circuit rejected the defendant's "vigorous[] assert[ion]" that "the case was

always one for arbitration under the contract provisions and the Federal Arbitration Act" and agreed

with the district court's "conclusion that the [defendant] was in default and [that] the request for stay

of the judicial proceedings made for the first time as the actual trial got underway was a pure

afterthought and came too late":

> The [district court] was eminently justified in its implied conclusion that the
> so-called defense of arbitration and the tardy demand for it was not asserted in good
> faith so that Contractor was in default.

*Id.* at 662.

In *Howard Hill, Inc. v. George A. Fuller Co., Inc.*, 473 F.2d 217 (5th Cir. 1973), the Fifth

Circuit considered presuit correspondence but affirmed "the district court's finding that Fuller [the

defendant] did not waive its rights under the arbitration clause" because "[a]t the time the complaint

was filed, both parties were insisting on arbitration but evidently had different ideas as to who would

arbitrate with whom." *Id.* at 219. The record contained

> intermittent correspondence between Hill and Fuller from March 1970 until March
> 1971, when suit was filed, and affidavits of persons who had knowledge of the
> negotiations between them. From these documents it appears that Hill first requested
> arbitration in March 1970. In response Fuller promptly proposed to submit Hill's
> claim "to arbitration," apparently intending to signify thereby that Fuller would
> submit the claim to arbitration between itself and the Hospital Authority. Hill agreed
> to this proposal in a letter and stated that the settlement made in such arbitration
> would be "satisfactory and acceptable," but Hill did not expressly waive the right to
> participate in arbitration with Fuller or unequivocally agree that an award resulting
> from arbitration between Fuller and the Hospital Authority would be binding as to
> the Hill-Fuller dispute. An affidavit from Fuller's Project Manager indicates Hill
> may have considered Fuller's proposal to be one for three-party arbitration. After
> March 1970, Hill continued to press for arbitration; Fuller declined direct arbitration

with Hill but undertook the preparation of Hill's claim for submission to the Hospital
Authority.

*Id.* at 218-19.

In *E.C. Ernst, Inc. v. Manhattan Const. Co. of Tex.*, 551 F.2d 1026 (1977), the Fifth Circuit
again considered presuit correspondence and found waiver based on a "pattern of pre- and post-suit
behavior." 551 F.2d at 1041. Six months before the plaintiff filed suit, the defendant told the
plaintiff that if it "requested arbitration, [the defendant] will file a suit in federal court asking that
arbitration be disallowed and that the contractor be required to furnish an engine meeting
specifications" under the parties' agreement. *See id.* at 1040. After the plaintiff filed suit, "[f]or the
next two and a half years," the defendant "engaged in discovery, presented cross-claims, . . . and filed
various motions" without bringing "up arbitration except to deny [the plaintiff's] assertion that it .
. . had earlier sought arbitration pursuant to the contract." *Id.* at 1040-41.

In *Triton Container Int'l Ltd. v. Baltic Shipping Co.*, 95 F.3d 54 (5th Cir. 1996)
(unpublished), the defendant's president had sent a postsuit fax to the plaintiff stating that it "will
settle the debt for the mutual satisfaction and we are not going to Moscow arbitration for this
matter." *Id.* at *1 n.3. The district court found that the president "made this statement . . . with full
awareness that issue had been joined in this [the district court] forum. Indeed, [the president]
instructed local counsel to relay information to the court. This knowledge coupled with the
unambiguous statement that Baltic was not going to go to Moscow for arbitration in this matter
indicates that Baltic made a deliberate choice to resolve the dispute in this forum rather than in
Moscow." *Triton Container Int'l Ltd. v. Baltic Shipping Co.*, Civ. A. Nos. 95-0427, 95-2229, 1995
WL 729329, at *3-4 (E.D. La. Dec. 8, 1995). On appeal, the Fifth Circuit affirmed the district

court's finding that the defendant's "president had waived in writing [the company's] contractual right to arbitrate." *Id.* at *1. The appellate court said nothing about the timing of the president's letter, merely observing that "[t]he right to arbitrate, like other contractual rights, may be waived." *Id.*

Although these Fifth Circuit cases dealt with somewhat different presuit conduct and also involved some postsuit conduct, they do not foreclose, but rather support, finding waiver here. Accenture India sent presuit letters stating that it refused to arbitrate because Abraham's claims were "wholly non-arbitrable" and without merit. These communications were as clear and unequivocal as (if not more so than) the communications in the cases finding waiver.

Accenture argues that the letters were "nothing more than the typical posturing that may occur where one party is attempting to 'stare down' the other party in the hope that the other party will simply give up." *Highlands Wellmont Health Network, Inc. v. John Deere Health Plan, Inc.*, 350 F.3d 568, 574 (6th Cir. 2003); *JPD, Inc. v. Chronimed Holdings, Inc.*, 539 F.3d 388 (6th Cir. 2008); *Shy v. Navistar Int'l Corp.*, 781 F.3d 820 (6th Cir. 2015).[6] The cases cited to support this argument are distinguishable. In *Highlands*, Wellmont Health Network sent John Deere Health Plan letters alleging over- and underpayments for rehabilitation services under the parties' contracts and asking John Deere to "set a date to discuss alternatives for dispute resolution, . . . including mediation, possible arbitration, or possible declaratory judgment action before the Federal court." *Highlands*, 350 F.3d at 572. John Deere's response letter disputed that it underpaid, demanded

---

[6] *See also Liberty Mut. Grp., Inc. v. Wright*, Civ. Action No. DKC 12-0283, 2012 WL 1446487, at *4 (D. Md. Apr. 25, 2012); *Araci v. Dillard's, Inc.*, No. 1:10cv253, 2011 WL 1388613, at *7 (S.D. Ohio Mar. 29, 2011); *C.B. Fleet Co. v. Aspen Ins. UK Ltd.*, 743 F. Supp. 2d 575, 587-88 (W.D. Va. 2010); *Enviro Petroleum, Inc. v. Kondur Petroleum, S.A.*, 91 F. Supp. 2d 1031, 1033-34 (S.D. Tex. 2000).

reimbursement of alleged overpayments, and stated that "we do not at this point agree to arbitration or other alternative dispute resolution." *Id.* Wellmont sued for a declaratory judgment that it was entitled to reimbursement for underpayments under the parties' contracts. *Id.* at 573. John Deere "immediately filed a motion to compel arbitration and stay proceedings." *Id.* The district court found waiver based on John Deere's presuit response letter. The Sixth Circuit reversed. The appellate court concluded that John Deere's letter, which "was sent during pre-commencement negotiations, . . . really amounts to nothing more than the typical posturing that may occur where one party is attempting to 'stare down' the other party in the hope that the other party will simply give up." *Id.* at 574. Even "[m]ore important[]," however, were the facts that "Wellmont's letter referenced only the 1997 Contract, which did not contain arbitration language, and suggested different means of alternative dispute resolution, only one of which was arbitration," and that "Wellmont offered no evidence that it ever attempted to invoke, let alone suggest, arbitration under the 2001 Contract." *Id.* Given these circumstances, the court of appeals concluded there was "no evidence that [John Deere] expressly waived arbitration under the 2001 Contract." *Id.*

Here, by contrast, Abraham's arbitration demands and Accenture India's June 2014 rejection letter clearly and repeatedly referred to the November 2010 Agreement and its arbitration clause. Unlike John Deere's response letter in *Highlands*, which merely declined to arbitrate "at [that] point," Accenture India's letter "categorically rejected" Abraham's request to arbitrate because his claims fell outside the Agreement's scope, were "non-arbitrable in nature," were "wholly non-arbitrable," and were without merit. (Docket Entry No. 13-4, at 2-3).

In *JPD, Inc. v. Chronimed Holdings, Inc.*, 539 F.3d 388 (6th Cir. 2008), the Sixth Circuit applied *Highlands* to reject a similar waiver argument based on presuit communications. The

plaintiff in *JPD* had objected to the defendant's EBITDA calculation and demanded arbitration under the parties' contract. The defendant sent a letter stating that the plaintiff's objection was not "sufficient for purposes of initiating the procedures specified in [their contract's arbitration provision]." *Id.* at 393. The plaintiff argued that this "letter . . . declar[ed the defendant's] unwillingness to engage in the arbitration process called for in the contract" and "should . . . bar the company from invoking arbitration." *Id.* The Sixth Circuit refused to apply waiver, holding that the defendant's "actions were not 'completely inconsistent' with its later reliance on the arbitration agreement" because the presuit letter could "be read as simply signaling to [the plaintiff] that [the defendant] would challenge the sufficiency of his EBITDA objection if he chose to proceed with arbitration." *Id.* at 394. The court concluded that "[t]he ambiguity of the letter's message, particularly given [the plaintiff's] failure to seek a clarification from [the defendant] before filing suit, prevent[ed] its meeting the 'completely inconsistent' test for conduct that waives the right to invoke the contract's arbitration provision." *Id.*

Unlike the plaintiff in *JPD*, Abraham sought clarification after Accenture India rebuffed his initial arbitration demand in March 2014. His May 2014 response letter again invoked arbitration under the Agreement, gave Accenture India notice of his nominated arbitrator, and gave Accenture India 30 days to appoint its own nominee, all in accordance with the arbitration clause in the Agreement. Accenture India's response unambiguously rejected arbitration in any form, on numerous grounds. It left none of the "ambiguity of the letter's message" present in *JPD*.

In *Shy v. Navistar Int'l Corp.*, 781 F.3d 820 (6th Cir. 2015), retired Navistar employees sued the company for allegedly failing to make required contributions to a supplemental benefit trust for their benefit. The Supplemental Benefit Committee ("SBC") managing that trust under an agreement

with Navistar intervened, "claiming that Navistar was improperly classifying various aspects of its business activities and structuring its business so as to evade its profit-sharing obligations under the agreement." *Id.* at 822. Navistar argued that SBC's claims were subject to arbitration, and the district court agreed. The district court found that Navistar had waived its right to arbitrate, however, based "on the following actions":

> 1. On August 3, 2009, Navistar declined the SBC's request to arbitrate the classification of Medicare Part D subsidies, claiming that even if the SBC prevailed this would not affect Navistar's obligations under the plan.
>
> 2. Navistar did not respond to a further notice of dispute sent on May 4, 2010 by the SBC relating to Navistar's treatment of Medicare Part D subsidies and requesting further information about the company's finances; in its next letter on April 6, 2011, Navistar simply provided an update as to its calculation of qualifying profits and did not mention the dispute.
>
> 3. On April 25, 2012, Navistar opposed the SBC's motion to intervene (in which the SBC sought an order compelling Navistar to provide the information required by the Plan) without raising arbitration as a defense. Navistar first argued that arbitration was required on March 11, 2013 in its answer to the SBC's complaint and its simultaneously filed reply to the SBC's motion to enforce the settlement agreement.

*Id.* at 828.

The Sixth Circuit reversed, holding that "Navistar's pre-litigation conduct and failure to raise arbitration in its response to the SBC's motion to intervene at the start of the litigation did not constitute a waiver of its right to arbitrate the claims raised by SBC." *Id.* at 827. The Sixth Circuit concluded that "[n]one of these three actions, individually or as a whole, amount[ed] to a waiver of arbitration." *Id.* at 828. First, "Navistar's letter to the SBC regarding Medicare Part D subsidies on August 3, 2009—item 1 in the list above—explicitly acknowledge[d] that, in the abstract, a dispute

over the classification of the subsidies is arbitrable." *Id.*[7] Second, although "Navistar's failure to respond to the SBC's May 4, 2010 notice of dispute as to the Medicare Part D subsidies—item 2 in the list above—[was] more concerning, . . . it still [did] not come close to waiver." *Id.* at 828. "Ignoring a formal invocation of arbitration procedures (if that is in fact what Navistar did, and the record [did] not provide evidence otherwise) [was] consistent with reliance on arbitration, at least in these circumstances." *Id.* at 828-29. There was "no evidence in the record that the SBC explained, either in its May 4 notice or at any other time, why it believed that the dispute over the subsidies was not moot, as previously suggested by Navistar." *Id.* at 829. "Navistar may have ignored the notice, therefore, not because it disclaimed reliance on arbitration but simply because it still considered the dispute moot and doubted that it was worth the SBC's time to pursue that matter." *Id.* The appellate court found persuasive the fact that the Circuit had "repeatedly determined that there was no waiver when a party refused to arbitrate, prior to the commencement of litigation, on the grounds that its opponent's claims were substantively weak." *Id.* (citing *JDP Inc.*, 539 F.3d at 394; *Highlands Wellmont*, 350 F.3d at 574). Because "Navistar's silence can easily be seen, in the words of the *Highlands* decision, as 'the typical posturing that may occur where one party is attempting to 'stare down' the other party in the hope that the other party will simply give up,'" it was "consistent with reliance on arbitration and not sufficient for waiver." *Id.* (quoting *Highlands Wellmont*, 350 F.3d at 574). Third, "Navistar's delay, once litigation commenced, in seeking arbitration of what information it had to provide to the SBC," did not waive arbitration

---

[7] The letter stated: "[W]e must at this time respectfully decline your request that the parties initiate the dispute resolution procedures in the Plan, as the dispute you identify has no impact whatsoever on the profit sharing payments due. . . . Navistar will agree, however, that this issue has been timely raised by the [SBC] in the event the dispute becomes material in any future year." *Navistar*, 781 F.3d at 829.

because the SBC motion to intervene "addressed only [its] right to intervene and not the validity of the . . . claims." *Id.* at 829-30.

*Navistar* is distinguishable. Navistar responded to the first arbitration demand by refusing to arbitrate "at th[at] time," and did not respond to the subsequent request. By contrast, Accenture India responded to all Abraham's arbitration demands by stating repeatedly and clearly that Abraham's claims were not arbitrable as well as without merit and that Accenture would not arbitrate. Unlike Navistar's Part D Medicare letter, Accenture India's June 2014 response letter did not acknowledge that any of Abraham's disputes were arbitrable, even "in the abstract." To the contrary, the letter "categorically rejected" his claims as "wholly non-arbitrable" and "non-arbitrable in nature," directed him to withdraw his notice of arbitration, and noted that if he did not do so, Accenture reserved its right to seek the fees and costs it incurred in responding to Abraham's claims.

Most of the district court cases Accenture India cites are also distinguishable because they did not involve categorical refusals to arbitrate. In *Liberty Mut. Grp., Inc. v. Wright*, Civ. Action No. DKC 12-0283, 2012 WL 1446487 (D. Md. Apr. 25, 2012), the defendant insurer had rejected the plaintiff's presuit request for an appraisal "at th[at] time" and the plaintiff's "refusal to permit [the insurer] to inspect the damaged contents of his home likely contributed to most of [the insurer's] delay in appointing an appraiser." *Id.* at \*4. In *Araci v. Dillard's, Inc.*, No. 1:10cv253, 2011 WL 1388613 (S.D. Ohio Mar. 29, 2011), after the plaintiff class "submitted their notice of intent to arbitrate, Dillard's responded by raising a challenge to class arbitration" and the plaintiffs' failure to pay the class arbitration fees, not arbitration generally. *Id.* at \*7. In *C.B. Fleet Co. v. Aspen Ins. UK Ltd.*, 743 F. Supp. 2d 575 (W.D. Va. 2010), the defendant sent the plaintiff a presuit letter suggesting that they "explore whether there [was] a basis to resolve any differences" before the

plaintiff "serve[d] the Complaint and litigation [could] commence" and closing with a rhetorical question: "[d]oesn't some pre-litigation communication make sense at this juncture?" *Id.* at 586. Viewed in context, this letter was "merely a suggestion that the parties voluntarily cooperate, at least temporarily, to narrow or otherwise resolve their disputes, rather than a binding commitment by [the defendant] to resolve its disputes in litigation to the exclusion of arbitration." *Id.* at 587.[8]

Accenture India argues that it reserved its rights under the Agreement in its letters rejecting Abraham's arbitration demands by including "without prejudice" at the beginning of each letter, stating that the letters were "without prejudice to any rights and remedies that Accenture may have under law and Contract," and "reserv[ing] its rights to claim any legal costs that may be incurred in this regard." (Docket Entry No. 13-4, at 4; *see also id.* 13-2, at 7). While Accenture India expressly refused to arbitrate, and did so categorically, it did not expressly reserve its right to arbitrate in its June 2014 response letter. Instead, it generally and vaguely warned that its response was "without prejudice to any rights and remedies that [it] may have under law and Contract." (Docket Entry No. 13-4, at 4). *See Carribean Ins. Servs., Inc. v. Am. Bankers Life Assur. Co. of Fla.*, 715 F.2d 17, 20 (1st Cir. 1983) (finding that a defendant waived its right to arbitrate by stipulating to an early trial

---

[8] In *Enviro Petroleum, Inc. v. Kondur Petroleum, S.A.*, 91 F. Supp. 2d 1031, 1033-34 (S.D. Tex. 2000), the court rejected the plaintiff's express waiver argument because the "case involve[d] pre-commencement conduct on the part of Defendants which, even when regarded in the light most favorable to Enviro, amount[ed] to nothing more than bluster or an attempt to 'stare down' Enviro in the hopes that Enviro will simply give up." *Id.* at 1033-34 (emphasis omitted). But the *Enviro* opinion does not reveal how the defendants reacted to the plaintiff's request for arbitration. In an earlier opinion in the case, the court stated that "Enviro's waiver argument boil[ed] down to the claim that Djody waived his right to arbitrate because he did not actively assist and partially finance Enviro's desire to pursue a claim against him." *Enviro Petroleum, Inc. v. Kondur Petroleum*, 79 F. Supp. 2d 720, 727 (S.D. Tex. 1999). Here, by contrast, Abraham's demand for arbitration merely sought to arbitrate in accordance with the Agreement's procedures. To the extent that *Enviro* holds that presuit correspondence can never result in waiver, it is inconsistent with Fifth Circuit case law and the weight of other circuit authority.

date and rejecting the defendant's argument that another part of the stipulation "expressly reserved its right to arbitration by preserving its 'rights . . . and defenses'").

Accenture's argument also fails to recognize that "[a] reservation of rights is not an assertion of rights." *Hooper v. Advance America, Cash Advance Cntrs. of Mo., Inc.*, 589 F.3d 917, 923 (8th Cir. 2009). In *Hooper*, the Eighth Circuit rejected a similar argument, concluding that the defendant's "statement in its motion to dismiss—that it might seek arbitration if the district court denied its motion to dismiss—did not forestall the prejudice Plaintiffs suffered." *Id.* at 923; *see also In re Mirant*, 613 F.3d at 587-88 (denying the defendant's motion to compel arbitration based on waiver despite the fact that the defendant had repeatedly and expressly reserved its right to arbitrate in footnotes in court filings because "[a] party cannot keep its right to demand arbitration in reserve indefinitely while it pursues a decision on the merits before the district court").

Accenture India argues that the claims Abraham asserted in his presuit arbitration demands "involved materially different allegations than those asserted here" and therefore Accenture could "not have knowingly relinquished [its] right to arbitration of the claims asserted *in this case* before those claims had been made." (Docket Entry No. 13, at 7). The thrust of the allegations giving rise to Abraham's claims in both the arbitration demand and this suit is the same: that Accenture failed to renew the 13-week agreement and compensate Abraham for his consulting services and expenses between November 2010 and November 2011 despite an Accenture employee's (Maxson Lewis) promises to the contrary. *Compare* (Docket Entry No. 1-2, ¶¶ 14-26 (state-court petition)), *with* (Docket Entry No. 13-1, at 4 (arbitration demand)). Accenture's responses to Abraham's detailed and exhaustive presuit arbitration demands knowingly waived its right to require arbitration of the similar claims he asserts in this suit.

Accenture India's presuit correspondence with Abraham shows that it acted inconsistently with its known right to arbitrate. The next issue is whether this prejudiced Abraham.

### 2.    Prejudice

Abraham contends that he does not need to show prejudice if Accenture expressly waived its rights. *See Hooper*, 589 F.3d at 923 n.8 (noting that "[t]here remains a circuit split as to whether the party asserting waiver of a right to arbitration must demonstrate prejudice at all" (collecting cases)); *see also Tyco*, 422 F.3d at 46 (requiring only a "modicum of prejudice"). The Fifth Circuit has not addressed whether prejudice is required when a party intentionally relinquishes a known right to arbitrate.[9] The Fifth Circuit case law does require prejudice when a party waives by substantially invoking the litigation process. *See Nicholas v. KBR, Inc.*, 565 F.3d 904, 908 (5th Cir. 2009) ("We have not, however, gone as far as the Seventh Circuit on this issue, and we do not do so here, as we continue to require a showing of prejudice, even if there is a substantial invocation of the process."). Abraham has not demonstrated any basis for a different standard when the waiver arises from other conduct inconsistent with the right to demand arbitration. *See Perry Homes v. Cull*, 258 S.W.3d 580, 594 (Tex. 2008) (refusing to relax the prejudice requirement as a matter of Texas state law because although "the federal courts are split on the issue,. . . the split is not very wide. Of the twelve regional circuit courts, ten require a showing of prejudice, and the other two treat it as a factor to consider."). Abraham must demonstrate prejudice to prevail on his waiver argument.

In a waiver analysis, "'prejudice' means 'the inherent unfairness in terms of delay, expense, or damage to a party's legal position that occurs when the party's opponent forces it to litigate an

---

[9] In *Triton*, the district court concluded that prejudice is not required when a party has expressly waived its right to arbitrate. *See Triton*, 1995 WL 729329, at *4 n.1. But the Fifth Circuit did not address this issue on appeal and its opinion affirming the district court's waiver finding is unpublished.

issue and later seeks to arbitrate the same issue.'" *Petrol. Pipe*, 575 F.3d at 480 (quoting *Republic*, 383 F.3d at 346). The Fifth Circuit has cited three factors as "'particularly relevant'" to determining prejudice in the context of substantially invoking the judicial process: "(1) whether discovery occurred relating to arbitrable claims; (2) the time and expense incurred in defending against a motion for summary judgment; and (3) a party's failure to timely assert its right to arbitrate." *Id.* (quoting *Republic*, 383 F.3d at 346). This does not, however, identify factors most important to assessing prejudice when a party waives the right to arbitrate in presuit communications.

Other circuits have addressed prejudice in this type of waiver. In *Tyco*, the First Circuit found that the record showed that Tyco, the party asserting waiver, had suffered prejudice because the party seeking to compel arbitration, Swartz, had engaged in "a deliberate strategy unilaterally designed to delay the arbitration proceedings, without either Tyco's consent or any ruling, either by an arbitrator or a court, on the merits of a motion to stay." 422 F.3d at 46. As a result, Tyco was "'out its expenses[]' in submitting the doomed AAA demand for arbitration, in filing its district court complaint, and in defending against not one, but two, motions for compelled arbitration." *Id.* Tyco had also "been required to commence a court proceeding following the AAA's dismissal of its demand for arbitration." *Id.*

Similarly, in *Brown v. Dillard's*, Brown, the party asserting waiver, alleged "three forms of prejudice: (1) delay due to Dillard's refusal to arbitrate; (2) costs and attorneys' fees incurred due to Dillard's refusal; and (3) the loss of potential evidence and witnesses due to the passage of time." 430 F.3d at 1012. Dillard's argued that "Brown did not suffer any cognizable prejudice as a result of its refusal to arbitrate," and relied on "cases in which no prejudice was found despite the fact that the non-moving party had incurred costs or attorneys' fees, or had otherwise suffered as a result of

delay." *Id.* The court of appeals rejected Dillard's argument. While, "[u]nsurprisingly, courts are reluctant to find prejudice to the plaintiff who has chosen to litigate, simply because the defendant litigated briefly (e.g., by filing a motion to dismiss or requesting limited discovery), . . . the question in [those] cases was whether a delay by a defendant in moving to compel arbitration after the initiation of litigation caused cognizable prejudice to the plaintiff." *Id.* By contrast, "Brown did not choose to litigate. She chose to arbitrate, and when she was rebuffed by Dillard's, she sued as a last resort," the panel had "no trouble concluding that the delay and costs incurred by Brown [were] prejudicial for the purpose of waiver analysis." *Id.* at 1012-13.

Like the parties urging waiver in *Tyco* and *Brown*, Abraham argues that he would be prejudiced by now having to arbitrate, in India. Abraham asserts that it may be too late to compel arbitration now in India due to Accenture's initial refusal to do so. (*Id.*; *see also* Docket Entry No. 8). The defendants have stipulated that if the court "grant[s] [their] Motion to Compel and Plaintiff pursues the claims at issue in this case in arbitration against Accenture Services Pvt. Ltd. in India, Accenture Services Pvt. Ltd. . . . will not challenge those claims on the basis that they are not arbitrable in India." (Docket Entry No. 19, at 4).[10] Although the defendants' stipulation to arbitrate Abraham's claims in India even if untimely under Indian law removes that potential for prejudice, it does not remove the other sources of prejudice Abraham identifies.

---

[10] Abraham moved to keep the record open for additional evidence on Indian law supporting his argument that he would suffer prejudice if the court compelled arbitration because his claim might now be time-barred. (Docket Entry No. 18). Given the defendants' stipulation and the court's finding of waiver, this motion is moot.

When Abraham demanded arbitration in India and Accenture refused, he was in India. (Docket Entry No. 15, ¶¶ 2, 9).[11] Abraham traveled to India in February 2014 until August 2014 specifically to resolve his disputes with Accenture and to arbitrate if they could not. (*Id.*, ¶ 9). After their efforts to negotiate failed, Abraham sent Accenture a letter demanding arbitration, notifying the company of his nominated arbitrator, and asking Accenture to nominate its own arbitrator under the Agreement's arbitration procedures. (Docket Entry Nos. 13-1, 13-3). When Accenture categorically refused to arbitrate Abraham's claims and implicitly threatened to seek legal costs if he persisted in trying to arbitrate, he reasonably chose to file suit in Texas. Accenture's refusal to arbitrate caused Abraham to incur the expense of traveling to India unsuccessfully. The refusal also delayed Abraham's efforts to obtain the relief he has sought since he first raised the disputes with Accenture and sought arbitration in February 2014. Relying on Accenture's refusal to arbitrate in India, Abraham filed this suit in the United States. He stopped working as an independent contractor with some ability to travel to India to work and became a full-time employee in the Houston area. (Docket Entry No. 15, ¶¶ 9-10). He has far less flexibility and economic resources to travel to India to arbitrate than he did when Accenture refused his demand to do so. (*Id.*).

Like the defendant in *Tyco*, Accenture India "should not be allowed to reject [Abraham's] demand for arbitration, stand idle, then submit a motion to compel arbitration after [Abraham] has been required to commence a court proceeding. . . ." *See Tyco*, 422 F.3d at 46; *see also Lane*, 243 F.2d at 367 ("A party cannot raise unjustifiable objections to a valid demand for arbitration, all the

---

[11] Accenture moved to strike Abraham's affidavit on the basis that he did not sign it. (Docket Entry No. 13). At the hearing, however, the court denied Accenture's motion to strike and granted Abraham leave to file a supplemental signed affidavit. (Docket Entry No. 17; *see also* Docket Entry No. 15). Accenture also argued that the affidavit contained inadmissible hearsay from Abraham's Indian counsel. The court does not rely on these hearsay statements in reaching its prejudice ruling.

while protesting its willingness in principle to arbitrate and then, when the other side has been forced to abandon its demand, seek to defeat a judicial determination by asking for arbitration after suit has been commenced."); *Dillard's*, 430 F.3d at 1012 ("[W]e have no trouble concluding that the delay and costs incurred by Brown are prejudicial for the purpose of waiver analysis.").

Accenture India argues that Abraham should have moved to compel arbitration under Indian law, not sued in the United States. It argues that Abraham should have asked the Chief Justice of India to appoint an arbitrator on Accenture India's behalf after it refused to do so, citing Section 11 of the Indian Arbitration and Conciliation Act of 1996. (Docket Entry No. 13, at 11; Docket Entry No. 13-5, at 5, ¶ 5). The parties' Agreement states that any disputes "shall be exclusively and finally settled by arbitration in accordance with the Indian Arbitration and Conciliation Act [of] 1996." (Docket Entry No. 7-2, ¶ 16.2). That Act did not require Abraham to ask the Chief Justice to make the appointment. The Act provided that if "a party fails to appoint an arbitrator within thirty days from the receipt of a request to do so from the other party," then "upon request of a party," "the appointment shall be made . . . by the Chief Justice or any person or institution designated by him." (Docket Entry No. 13-6, § 11(4)); *see also id.* § 11(6) (providing that "a party *may* request the Chief Justice . . . to take the necessary measure" when another party fails to abide by the parties' agreed upon appointment procedure (emphasis added)). In each of its letters refusing Abraham's arbitration demands, Accenture India "reserved [its] rights to claim any legal costs that may be incurred in this regard." (Docket Entry No. 13-2, at 7; 13-4, at 4). Abraham reasonably perceived that Accenture

India's responses "threaten[ed] to seek legal costs in court and outside of arbitration if [he] continued to pursue arbitration." (Docket Entry No. 15, ¶ 3).[12]

Abraham has demonstrated that requiring him to arbitrate his disputes in India now that he has returned to the United States, filed suit in Texas, and moved his work back to Texas, all after Accenture India repeatedly and categorically refused to arbitrate when he was in India and able to do so, would cause him prejudice.

## IV.    Conclusion

The court finds that Accenture waived its right to arbitrate under the Agreement through its unequivocal presuit communications and conduct, and that requiring Abraham to arbitrate now would cause him prejudice.[13]   The defendants' motion to compel arbitration and to stay the case pending arbitration, (Docket Entry No. 7), is denied.   Abraham's motion to file a supplemental response memorandum is granted and his motion to keep the record open is denied as moot. (Docket Entry No. 18).

SIGNED on July 13, 2015, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

---

[12]   In *Navistar*, the Sixth Circuit concluded that "Navistar's pre-litigation behavior did not delay proceedings in a way that actually prejudiced the SBC" because the "SBC could have sought a court order compelling arbitration at any time after Navistar refused to arbitrate the issue, but it never did so." *Navistar*, 781 F.3d at 829.   But unlike Accenture India's correspondences here, Navistar never threatened, implicitly or explicitly, to seek costs and legal fees if the SBC continued to pursue arbitration.

[13]   This conclusion does not reflect any assessment of the merits of Abraham's claims.   *See Weingarten Realty Investors v. Miller*, 661 F.3d 904, 909 (5th Cir. 2011) ("A determination on the arbitrability of a claim has an impact on what arbiter—judge or arbitrator—will decide the merits, but that determination does not itself decide the merits.").